SunTrust

[redacted]

SunTrust Bank
CLSC - Orlando
7455 Chancellor Drive
Orlando, FL 32809
(407) 762-6157

[redacted]t

EXHIBIT A

"Bank" referred to in this Agreement is **SunTrust Bank**

"Borrower" referred to in this Agreement is **DENNIS R FOX**

In consideration of Bank granting Borrower an Access 3 Equity Line Account ("Account or [redacted]ccount") and of any credit which may be extended by Bank thereunder, by virtue of any advance of funds by Bank under this Access 3 Equity Line Account Agreement and Disclosure Statement, as may be amended (the "Agreement") which creates a charge against the Account (hereinafter collectively "Advance" or "Advances"), Borrower agrees as follows:

**1. Account.** The Account establishes a line of credit upon which Borrower may request Advances for a period of ten (10) years ("the Draw Period"), up to the amount of $50,000.00 ("Credit Limit"). Borrower promises to pay Bank the principal amount of all Advances plus interest, finance charges, late fees and all other amounts and charges at the time, place, and in the manner specified by Bank on the monthly statement. The Account shall be payable in full no later than fifteen (15) years from the date of execution of this Agreement ("the Maturity"), the last five (5) years before Maturity being the repayment period ("Repayment Period").

**2. Access.** The Account may be accessed by (i) use of a draft ("Access 3 Check") supplied by Bank; (ii) use of an Access 3 Equity Line credit card ("Access 3 Credit Card") issued by Bank; (iii) Bank to provide overdraft coverage; (iv) other means Bank may authorize from time to time; or (v) any other advancement of funds by Bank on Borrower's behalf.

**3. Advances.** Borrower may obtain an Advance on the Account from time to time up to the available Credit Limit. The available credit for Advances is the Credit Limit, minus the sum of all unpaid Advances (including Advances initiated, but not yet posted to the Account) and any other charges posted to the Account. The minimum amount of any Access 3 Check Advance shall be $250.00, however, if Borrower chooses to repay an Access 3 Check Advance under Option 3 defined below, the minimum Advance amount shall be $5,000.00. No minimum Advance amount shall be required by Bank for purchases made with the Access 3 Credit Card. Borrower may make up to eight (8) Access 3 Credit Card transactions daily, five (5) of which may be ATM cash advances, with a maximum aggregate daily total of $1,200.00. If Borrower elects overdraft coverage as provided in paragraph 4, such Advances shall be in $100.00 increments.

Borrower will not access the Account when such Advance will exceed Borrower's available Credit Limit, result in a default under this Agreement, or would violate any law. Bank may refuse to make any requested Advance, including but not limited to, returning unpaid any Access 3 Check on the Account or refusing authorization for an Access 3 Credit Card transaction if (i) the request does not conform to the requirements of this paragraph; or (ii) at the time of the request, outstanding Account balance, as reflected by Bank's records, exceeds (or upon making the Advance would exceed) the Credit Limit; or (iii) the ability to make Advances has been suspended as provided for in this Agreement. However, Bank, at its option, may pay any Advance which will exceed the Credit Limit and Borrower will pay any amount over the Credit Limit in the manner Bank requests.

**4. Overdraft Coverage.** Bank is authorized to advance funds from the Access 3 Account to provide overdraft coverage for **Account Number** ________________ maintained by Borrower with Bank ("Bank Account"). Whenever Borrower writes checks or otherwise creates debits which overdraw the Bank Account, Bank will make an Advance from the Access 3 Account in $100.00 increments to the Bank Account. If the Credit Limit on the Access 3 Account is not sufficient to cover the entire overdraft, but is sufficient to cover any one or more items creating such overdraft, Bank will make an Advance from the Access 3 Account, up to the amount of the available Credit Limit, in order to pay such item(s). If Bank makes an Advance which exceeds the Credit Limit, Borrower will pay any amount over the Credit Limit in the manner Bank requests. In the event that the Bank Account is held jointly with other individuals ("Joint Account Holder"), overdrafts on the Bank Account created by the Joint Account Holder will be provided overdraft coverage as prescribed in this paragraph.

**5. Interest Rate and Repayment Options.** For the first six (6) month period following the date of this Agreement the **ANNUAL PERCENTAGE RATE**, for Option 1 and Option 2 draws shall be fixed a rate of Two & 99/100 percent (2.990%). The Current Daily Periodic Rate is 0.00819% and the corresponding **ANNUAL PERCENTAGE RATE** is 2.990%. The **ANNUAL PERCENTAGE RATE** for Option 3 Advances shall not be subject to this promotional pricing. After the expiration of this six (6) month period, the **ANNUAL PERCENTAGE RATE** will be variable and calculated as described below.

The Annual Percentage Rate on all Advances shall be calculated at a rate equal to The Wall Street Journal Prime Rate plus 0.250 %. The maximum **ANNUAL PERCENTAGE RATE** will not exceed 18% per annum. Options One and Two have a variable rate of interest and the **ANNUAL PERCENTAGE RATE** can change as a result. The **ANNUAL PERCENTAGE RATE** for Option 3 and the Repayment Period shall be a fixed rate calculated using the index and margin disclosed above. At the time of an Access 3 Check Advance, Borrower will choose a repayment option which will apply only during the Draw Period. By the payment due date shown on the monthly statement ("the Periodic Statement"), Borrower agrees to pay monthly either (i) the total amount owing on the closing date as shown on the Periodic Statement (the "New Balance") or (ii) any portion of the New Balance, so long as Borrower pays at least a "Minimum Payment" which is the sum of the minimum payments for each of the three (3) Options as specifically set forth below or $100.00, whichever is greater, plus any applicable insurance premiums, late charges, and/or miscellaneous fees as set forth on the Periodic Statement. In addition, if the New Balance exceeds the Credit Limit, Borrower will pay the amount indicated on the Periodic Statement, to reduce the Account balance to within the Credit Limit. All payments must be made in United States dollars and must be drawn on a financial institution located in the United States. Unless otherwise required by applicable law, payments (whether regular payments or prepayments) will be applied first to any loan fees (such as late fees or bad check fees), second to insurance premiums, third to accrued unpaid interest, and thereafter to reduce my outstanding principal balance, or in any other order Bank wishes.

Option 1 - Revolving Line of Credit
The minimum payment due for funds advanced under this Option shall be 1.5% of the bal[redacted] for Option 1. All Advances made by Access 3 Credit Card or for overdraft protection will be governed by and [redacted]d under Option 1.

Option 2 - Interest Only
The minimum payment due for funds advanced under this Option shall be the accrued inter[redacted]n the balance for Option 2. Any Advance made under this option will be converted to Option 1 three (3) yea[redacted]er such Advance was posted to the Account.

Option 3 - Fixed Rate/Fixed Term
The **ANNUAL PERCENTAGE RATE** on Advances made under this feature shall be fixed at th[redacted]e the Advance is posted to the Account. Borrower will select a term of twelve (12) to sixty (60) months by noting same on the Access 3 Check at the time of the Advance. If Borrower does not specify a term, the term for the Advance shall be sixty (60) months. The payment shall be based upon the amount of the draw, the interest rate, and the repayment term selected. Each draw taken under this option shall be amortized to establish the payment amount. Any remaining balance at the end of the term shall be converted to Option I for repayment.

Repayment Period
The **ANNUAL PERCENTAGE RATE** for the Repayment Period shall be fixed at the expiration of the Draw Period. The term for the repayment of the outstanding balance will be five (5) years. The monthly payment amount will be based upon the balance, interest rate and the five (5) year term.

**6. Statements and Finance Charge.** Bank will send a monthly Periodic Statement at the end of each billing cycle, as determined by Bank, ("Billing Cycle") in which the Account has a debit or credit balance of more than $1.00 or on which a finance charge has been imposed. The finance charge ("Finance Charge") shall be the sum of the Cash Advance Fee described in paragraph 8 and the periodic finance charge ("Periodic Finance Charge"). A Periodic Finance Charge will be imposed on the Account and will be shown on the next Periodic Statement even if the New Balance was paid in full on or before the payment due date of the prior Periodic Statement. There is no grace period before the Periodic Finance Charge begins to accrue.

For each Billing Cycle, the Periodic Finance Charge begins to accrue on Access 3 Check Advances on the day the Check is received by the Bank for payment and begins to accrue on all other Advances on the day of the transaction. Bank calculates the Periodic Finance Charge on Options 1 and 2 by applying the Daily Periodic Rate to the average daily balance. To determine the "Daily Balance," take the beginning balance of the three (3) Options each day starting with the New Balance from the last Periodic Statement, plus all purchases, cash advances, Access 3 Checks, or any other Advances posted through that day, minus any unpaid Finance Charge, other charges, payments or other credits posted through that day. The "Average Daily Balance" is the sum of all the Daily Balances for the Billing Cycle divided by the actual number of days in the Billing Cycle. The Periodic Finance Charge for Option 3 will be calculated using straight loan amortization for each Advance. The Periodic minimum **FINANCE CHARGE** for the Account is $.50. The Periodic Finance Charge for the Account is the sum of the Periodic Finance Charges for the three (3) Options.

Bank will safekeep the paid Access 3 Checks. Bank will make available photocopies of Access 3 Checks and other instruments upon request. (If such request is not made in connection with a billing error inquiry, it may be subject to Research and Photocopy charges as described in paragraph 8).

Each Access 3 Check will be deemed to be in item for purposes of the Uniform Commercial Code ("UCC") of the state in which Bank is located and the time periods and other requirements for examining Periodic Statements and reporting improper entries will begin from the time Periodic Statements are sent or made available to Borrower. Bank assumes no responsibility for entries included on Periodic Statements not received unless Borrower gives notice within sixty (60) days of the date on which the Periodic Statement is customarily mailed, that it was not received.

The rules for stopping payment on Access 3 Checks shall be the same as Bank's rules for stopping payment on checks written on deposit accounts.

**7. Corresponding Annual Percentage Rate and Daily Periodic Rate.** The corresponding Annual Percentage Rate and the Daily Periodic Rate for each Billing Cycle will depend upon the Prime Rate. The "Prime Rate" means the per annum rate of interest published from time to time by The Wall Street Journal in its "Money Rates" listings, as the Prime Rate on the fifteenth day of the calendar month preceding the first day of the Billing Cycle. In the event that on any particular day *The Wall Street Journal* publishes more than one Prime Rate, for purposes of this Agreement, the Prime Rate shall mean the highest Prime Rate so published. The number of days in the Billing Cycle and the statement closing date will be shown on each Periodic Statement. For example, if the statement closing date is September 1st and there are thirty (30) days in the Billing Cycle, to calculate the first day in the Billing Cycle, subtract thirty (30) days from September 1st, to arrive at August 2nd. This Billing Cycle would begin August 2nd and end September 1st. So if the first day of the Billing Cycle is August 2nd, the Annual Percentage Rate for that Billing Cycle will equal the Prime Rate in effect on July 15th, plus the margin. The Daily Periodic Rate equals the Prime Rate plus a margin divided by 365. The corresponding Annual Percentage Rate and Daily Periodic Rate may increase or decrease according to increases or decreases in the Prime Rate. If the corresponding Annual Percentage Rate and Daily Periodic Rate increase, the Periodic Finance Charge and Minimum Payment may increase. The increases and decreases caused by changes in the Prime Rate will take effect on the first day of each succeeding Billing Cycle and will remain in effect for the entire Billing Cycle. The corresponding Annual Percentage Rate and Daily Periodic Rate will not change during the course of any one Billing Cycle. The **CURRENT DAILY PERIODIC RATE** is 0.01233 % and the corresponding **ANNUAL PERCENTAGE RATE** is 4.500 %. These rates are based upon the Prime Rate of 4.250 % which was in effect as of the fifteenth day of MARCH 2003. The corresponding Annual Percentage Rate and Daily Periodic Rate applicable to the first Billing Cycle of the Account may differ from the disclosure above. The Annual Percentage Rate does not include costs other than interest.

**8. Charges.** Bank may also assess the following amounts ("Charges") to the Account.
A. A late payment charge not to exceed 5.000% of any unpaid amount due, with a minimum charge of $5.00 and a maximum charge of $25.00, if not received within ten (10) days of the payment due date;
B. An over limit fee of $25.00 for a New Balance that exceeds the Credit Limit at the end of the Billing Cycle;
C. A stop payment charge of $20.00 for placing a stop payment on an Access 3 Check;
D. A return check fee of $$20.00 on any check, draft, or order submitted as payment on the Account which is returned unpaid;

E. Cash Advance fee of $5.00 for use of the Access 3 Credit Card at an ATM to obtain an [redacted]vance;
F. A research and photocopy charge for locating, copying, or furnishing Access 3 Checks, [redacted]tements, or other evidence of Advances or credits to the Account in an amount not to exceed the following: $[redacted]0 per check copy, $2.00 per statement copy and $12.00 per hour of research time.
G. A premium for credit life/disability insurance if Borrower has purchased the optional cred[redacted]roducts.

**9. Security.** To secure the payment of all Advances, charges, authorized debits under the Ac[redacted]unt and any other sums for which Borrower becomes obligated under this Agreement, Borrower will (i) execu[redacted]a Deed to Secure Debt, Deed of Trust, or Mortgage ("Security Instrument") which grants a lien upon Borrow[redacted]s residence ("Real Property") in favor of Bank; and (ii) comply with all promises, understandings or obligations of the Grantor set forth in said Security Instrument, which shall constitute material obligations under this Agreement.

In addition to the Real Property, all property in or coming into the possession, control or custody of Bank, or in which Bank has or hereafter acquires a lien, security interest, or other right, shall secure and serve as collateral for all Advances, charges, authorized debits under the Account and any other sums for which Borrower becomes obligated under this Agreement, with the exception of Borrower's deposit accounts at Bank which shall not secure Access 3 Credit Card Advances. Additionally, the Security Instrument will secure future advances as more fully set forth therein.

**10. Tax Implications.** Borrower should consult a tax advisor regarding the deductibility of the interest and charges paid pursuant to this Agreement.

**11. Closing Costs.** Borrower will pay all charges incurred in connection with the preparation, execution, and recording of the Security Instrument securing this Account ("Closing Costs") as set forth below.

| | | |
|---|---|---|
| APPRAISAL | $ 18.00 | (**) |
| FLOOD CERT | $ 4.50 | (**) |
| RECORDING FEES | $ 43.50 | (**) |
| INTANGIBLE TAX | $ 100.00 | (**) |
| DOCUMENTARY STAMPS | $ 175.00 | (**) |
| | $ | ( ) |
| | $ | ( ) |
| | $ | ( ) |
| | $ | ( ) |
| | $ | ( ) |

A double asterisk after the dollar amount indicates that the Closing Cost was paid by Bank. Borrower shall reimburse Bank for the Closing Costs it paid, if Borrower pays the balance in full and closes the Account within three (3) years of opening the Account. The amount of $ 341.00 Closing Costs, paid by the Bank, shall be added to the Account balance at the time of payoff.

**12. Appraisals.** In addition to the initial appraisal of the Real Property, Bank, at its option, may require new appraisals of the Real Property, and Borrower will pay any fees associated therewith.

**13. Insurance.** Borrower will maintain a fire, extended coverage, and other perils insurance policy, and flood insurance, if required, on the Real Property, which names Bank as loss payee, in an amount sufficient to cover the amount of the Credit Limit hereunder, plus any amounts owing under other outstanding recorded security instruments, and to provide Bank with appropriate evidence of said insurance. This insurance may be obtained from any agent or company of Borrower's choice, subject to the terms of the Security Instrument. Should Borrower fail to maintain such insurance at any time during the existence of the Account, Bank is authorized to obtain such insurance on behalf of and charge the premium to the Account or Bank may cancel the Account and declare the entire outstanding balance to be immediately due and payable.

**14. Change of Status or Sale of Real Property.** If the Real Property ceases to be Borrower's principal residence, Borrower's right to receive Advances shall terminate and Borrower shall not initiate any Advances. Borrower will notify Bank of any agreements to sell or transfer ownership of all or any part of the Real Property or if all or any part of the Real Property is sold or transferred without consent or by operation of law, or if a notice of condemnation is received. Upon the transfer of any part of or interest in the Real Property, as a result of Borrower's action or inaction, the entire balance outstanding under the Account will immediately become due and payable and Bank may cancel the Account.

**15. Encumbrance of Real Property.** Borrower will not create, assume, or allow to exist any mortgage, lien, security interest, title retention device or other encumbrance covering all or any part of the Real Property, excluding only prior encumbrances and encumbrances held by Bank and liens for government charges which are not delinquent, without first notifying Bank of such fact via registered U.S. Mail and obtaining the prior written approval of Bank. Borrower has a material obligation under this Agreement to so notify Bank and obtain its consent. Bank may cancel the Account and may declare the entire outstanding balance immediately due and payable if Borrower violates this obligation. In the event that Borrower fails to provide Bank with said notice, and subsequently obtains an Advance from the Account, Borrower will be deemed to have intentionally concealed material facts in order to induce Bank to honor said subsequent Advance.

**16. Changes in Credit Limit and Freezing of Loan Account.** Bank may increase the Credit Limit at any time without notice. Bank may temporarily prohibit additional Advances or reduce the Credit Limit in the following situations: (i) the value of the Real Property declines significantly below its appraised value for purposes of the Account; (ii) Bank reasonably believes that Borrower will be unable to fulfill the repayment obligations under the Account because of a material change in financial circumstances; (iii) Borrower is in default of any obligation under this Agreement; (iv) action by a governmental body precludes Bank from imposing the Annual Percentage Rate provided for in this Agreement; (v) action by a governmental body adversely affects the priority of Bank's security interest in the Real Property to the extent that the value of the security interest is less than 120% of the Credit Limit; (vi) Bank is notified by its regulator that continued Advances constitute an unsafe and unsound practice; (vii) the maximum interest rate hereunder is reached. If Bank temporarily prohibits additional Advances on the Account and/or reduces the Credit Limit based upon any of the foregoing situations, Bank will provide Borrower with written notice of said action not later than three business days after the action is taken. The notice will explain how Borrower can request

einstatement of credit privileges.

**17. Change of Terms.** In addition to changes described elsewhere in this Agreement, Ban[redacted]nge the index and margin, as permitted by federal law, if the original index is no longer available. The [redacted]d margin will result in an Annual Percentage Rate comparable to the one in effect at the time [redacted]ndex became unavailable; (ii) make a specified change if Borrower agrees to it in writing at that time; [redacted]ange that will unequivocally benefit Borrower throughout the term of this Agreement; or (iv) make [redacted]ant change to terms.

**18. Notification.** Borrower will notify Bank promptly in writing of any change of addr[redacted]ge in financial condition, or of any unauthorized use of the Account. As a material obligation under th[redacted], Borrower will update the information set forth in the Account application and furnish Bank with additional financial aid or other information as it may request. Borrower will immediately telephone Bank and confirm by letter if any Access 3 Checks or the Access 3 Credit Card are lost or stolen, and upon failure to do so, Borrower will assume full responsibility if Bank should, without negligence, pay such Access 3 Checks. At the time of this Agreement, the telephone number at Bank for reporting lost or stolen checks is (888) 461-8862. Borrower's liability for the unauthorized use of the Access 3 Credit Card shall not exceed the lesser of $50.00 or the amount of money, property, labor or services obtained by the unauthorized use of the Access 3 Credit Card prior to the time Borrower notifies Bank of the loss or theft of the card. Bank shall not be responsible to Borrower in any manner if anyone refuses to accept an Access 3 Check as a manner of payment.

**19. Default and Cancellation.** In the event Borrower fails to make any required payment on the Account when due; or if Borrower acts or fails to act in a way that adversely affects the Real Property, or any right of Bank in such Real Property (including but not limited to, the destruction, illegal use or failure to maintain the Real Property such that it adversely affects Bank's security interest in the Real Property); or if the Real Property is foreclosed on by a prior lienholder; or if the title to the Real Property is taken through eminent domain; or if Borrower commits fraud or makes a material misrepresentation relative to the Agreement or any other instrument, document, transfer, conveyance, assignment or application provided in connection with the Account; or if any Borrower dies, then Bank may cancel the Account without notice, and shall have no further obligation to make any Advances against the Account, and any balance outstanding shall, without notice or demand, at Bank's option, become immediately due and payable. In the event the collection of the outstanding balance is referred to any attorney, Borrower will pay the costs of collection including 15% of the principal and interest as attorney's fees. Upon default, Bank may exercise any and all rights contained in this Agreement, the Security Instrument or any other rights provided to Bank by law, but not limited to, the right to sell the Real Property at a public auction or as provided by law. Bank may waive or decline to enforce any of its rights under this Agreement at any time without affecting any of its other rights under this Agreement. Furthermore, upon default, Borrower's authorization to initiate Advances on the Account shall terminate and Bank may return any Access 3 Checks unpaid or decline Access 3 Credit Card charges or cash advances, without liability to Borrower and without prior notification.

**20. Termination of Account.** Any Borrower may terminate the Account at any time by giving written notice to Bank. In the event the Account is terminated, Bank at its option, may allow Borrower to continue to make regular monthly payments, or to restructure the indebtedness owed pursuant to this Agreement in a mutually agreeable manner, or may require Borrower to pay the entire unpaid balance in full. Upon Account termination, this Agreement shall remain in full effect (except for the obligation of Bank to make Advances) until all amounts which Borrower may owe Bank pursuant to this Agreement have been paid in full. At the request of Bank, Borrower will surrender to Bank the unused Access 3 Checks and any Access 3 Credit Cards for the Account.

**21. Joint Account.** If more than one person has signed this Agreement, or if an additional borrower is added to the Account at a later date, all obligations and liabilities shall be joint and several. All Borrowers are jointly and severally liable for all indebtedness in connection with this Account regardless of whether said indebtedness arises by use of Access 3 Check and/or Access 3 Credit Card issued to either one or both of the Borrowers, or by overdraft protection, fees, and charges. If this is a joint account, Bank may honor a request from either of the Borrowers to prohibit and/or dishonor further Advances.

**22. Miscellaneous.** If more than one borrower signs this Agreement, all such references shall also refer to and include all borrowers signing below and/or persons who may subsequently sign an Agreement in connection with this Account and any persons to whom an Access 3 Credit Card has been or may be issued in the future. In connection with this Account and/or any person(s) using said Credit Card. Borrower cannot transfer the Account balance or any rights under this Agreement. Bank may, without further notice to Borrower, transfer all or a part of the Account balance and Bank's rights under this Agreement to another person or entity. As material obligations under this Agreement, the Real Property will be used as Borrower's primary residence and will not be used as rental property and that Borrower will not borrow additional funds from any party holding a first mortgage on the Real Property. This Account is opened by Bank with the expectation that Borrower will request Advances hereunder.

**23. Real Property Clarification.** Notwithstanding anything to the contrary herein, "Real Property" may also include other real property without being limited to the Borrower's residence, principal residence or primary residence.

By signing below Borrower makes the covenants, promises and agreements set forth in this Agreement anc acknowledges receipt of a copy of this Access 3 Equity Line Account Agreement and Disclosure Statement.

Borrower ______ [signature]
DENNIS R FOX

Date 5/5/03

Borrower ______

Date ______

## Billing Rights

### Keep this Notice for Future Use

This notice contains important information about Borrower's rights and responsibilities under [redacted] Fair Credit Billing Act.

**Notify Bank in Case of Errors or Questions About the Bill.**

If Borrower thinks the bill is wrong, or needs more information about a transaction on the bil[redacted]rrower will write Bank on a separate sheet at the address below:

SunTrust Bank
P.O. Box 305110
CreditLine Operations
Nashville, TN 32898-4911

Borrower will write as soon as possible. Bank must hear from Borrower no later than sixty (60) days after Bank sent the first bill on which the error or problem appeared. Borrower can telephone Bank, but doing so will not preserve Borrower's rights.

In the letter, Borrower will give Bank the following information:

> Borrower's name and account number.
> The dollar amount of the suspected error.
> A description of the error and explain, if Borrower can, why he believes there is an error. If Borrower needs more information, he will describe the item he is not sure about.

If Borrower has authorized Bank to pay his bill automatically from his checking or savings account, Borrower can stop the payment on any amount that he thinks is wrong. To stop payment, the letter must reach Bank three (3) business days before the automatic payment is scheduled to occur.

**Borrower's Rights and Bank's Responsibilities After Bank Receives Written Notice**

Bank must acknowledge Borrower's letter within thirty (30) days, unless it has corrected the error by then. Within ninety (90) days, Bank must either correct the error or explain why it believes the bill was correct.

After Bank receives the letter, it cannot try to collect any amount Borrower has questioned, or report Borrower as delinquent. Bank can continue to bill Borrower for the amount questioned, including finance charges, and it can apply any unpaid amount against the credit limit. Borrower does not have to pay any questioned amount while Bank is investigating, but is still obligated to pay the parts of the bill that are not in question.

If Bank finds that it made a mistake on the bill, Borrower will not have to pay any finance charges related to any questioned amount. If Bank did not make a mistake, Borrower may have to pay finance charges, and will have to make up any missed payments on the questioned amount. In either case, Bank will send Borrower a statement of the amount owed and the date that it is due.

If Borrower fails to pay the amount that Bank thinks that Borrower owes, it may report him as delinquent. However, if Bank's explanation does not satisfy Borrower and he writes to Bank within ten (10) days telling it that he still refuses to pay, Bank must tell anyone it reports Borrower to that he has a question about the bill. And, Bank must tell Borrower the name of anyone it reported him to. Bank must tell anyone it reports Borrower to that the matter has been settled between Borrower and Bank when it finally is.

If Bank does not follow these rules, it cannot collect the first $50.00 of the questioned amount, even if the bill was correct.

**Special Rules for Credit Card Purchases**

If Borrower has a problem with the quality of property or services that he purchased with a credit card, and has tried in good faith to correct the problem with the merchant, Borrower may have the right not to pay the remaining amount due on the property or service. There are two limitations on this right:

(a) Borrower must have made the purchase in his home state or, if not within his home state, within one hundred (100) miles of his current mailing address; and

(b) The purchase price must have been more than $50.00.

The limitations do not apply if Bank owns or operates the merchant, or if it mailed Borrower the advertisement for the property or services.

SunTrust Banks, Inc. Copyright 1996

EXHIBIT B

[redacted]

VICES
D.

R

FX

[redacted]

JED PITTMAN, PASCO COUNTY CLERK
06/04/03 02:14pm 1 of 9
OR BK 5385 PG 1361

This Mortgage prepared by:

50,000.

N[redacted]
C[redacted]
A[redacted]

[redacted]

# MORTGAGE

## FOR USE WITH SECURED REVOLVING CREDIT AGREEMENT

**MAXIMUM LIEN.** The total amount of indebtedness secured by this Mortgage may decrease or increase from time to time, but the maximum amount of principal indebtedness which may be outstanding at any one time shall not exceed $50,000.00, plus interest, and amounts expended or advanced by Lender for the payment of taxes, levies or insurance on the Property, and interest on such amounts.

**THIS MORTGAGE** dated May 5, 2003, is made and executed between DENNIS R FOX, whose address is 18647 AUTUMN LAKE BLVD, HUDSON, FL 34667 and IRIS A FOX, HUSBAND AND WIFE whose address is 18647 AUTUMN LAKE BLVD, HUDSON, FL 34667 (referred to below as "Grantor") and SunTrust Bank, whose address is 7455 Chancellor Drive, Orlando, FL 32809 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in PASCO County, State of Florida:

See EXHIBIT A, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

The Real Property or its address is commonly known as 18647 AUTUMN LAKE BLVD, HUDSON, FL 34667.

**REVOLVING LINE OF CREDIT.** Specifically, in addition to the amounts specified in the Indebtedness definition, and without limitation, this Mortgage secures a revolving line of credit under which, upon request by Borrower, Lender, within twenty (20) years from the date of this Mortgage, may make future advances to Borrower. Such future advances, together with interest thereon, are secured by this Mortgage. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in this Mortgage and any intermediate balance.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT WITH THE CREDIT LIMIT OF $50,000.00, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this

L[redacted]

## MORTGAGE
## (Continued)



Mortgag[redacted]

**POSSESS[redacted] AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Prop[redacted] shall be governed by the following provisions:

**Poss[redacted]on and Use.** Until Grantor's interest in any or all of the Property is foreclosed, Grantor may (1) remain in possession and cont[redacted]of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

Without otherwise limiting Grantor's covenants as provided herein, Grantor shall not without Lender's prior written consent, remove or permit the removal of sand, gravel or topsoil, or engage in borrow pit operations, or use or permit the use of the Property as a land fill or dump, or store, burn or bury or permit the storage, burning or burying of any material or product which may result in contamination of the Property or the groundwater or which may require the issuance of a permit by the Environmental Protection Agency or any state or local government agency governing the issuance of hazardous or toxic waste permits, or request or permit a change in zoning or land use classification, or cut or remove or suffer the cutting or removal of any trees or timber from the Property.

At its sole cost and expense, Grantor shall comply with and shall cause all occupants of the Property to comply with all Environmental Laws with respect to the disposal of industrial refuse or waste, and/or the discharge, processing, manufacture, generation, treatment, removal, transportation, storage and handling of Hazardous Substances, and pay immediately when due the cost of removal of any such wastes or substances from, and keep the Property free of any lien imposed pursuant to such laws, rules, regulations and orders.

Grantor shall not install or permit to be installed in or on the Property, friable asbestos or any substance containing asbestos and deemed hazardous by federal, state or local laws, rules, regulations or orders respecting such material. Grantor shall further not install or permit the installation of any machinery, equipment or fixtures containing polychlorinated biphenyls (PCBs) on or in the Property. With respect to any such material or materials currently present in or on the Property, Grantor shall promptly comply with all applicable Environmental Laws regarding the safe removal thereof, at Grantor's expense.

Grantor shall indemnify Lender and hold Lender harmless from and against all loss, cost, damage and expense (including, without limitation, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that Lender may incur as a result of or in connection with the assertion against Lender of any claim relating to the presence or removal of any Hazardous Substance, or compliance with any Environmental Law. No notice from any governmental body has ever been served upon Grantor or, to Grantor's knowledge after due inquiry, upon any prior owner of the Property, claiming a violation of or under any Environmental Law or concerning the environmental state, condition or quality of the Property, or the use thereof, or requiring or calling attention to the need for any work, repairs, construction, removal, cleanup, alterations, demolition, renovation or installation on, or in connection with, the Property in order to comply with any Environmental Law; and upon receipt of any such notice, Grantor shall take any and all steps, and shall perform any and all actions necessary or appropriate to comply with the same, at Grantor's expense. In the event Grantor fails to do so, Lender may declare this Mortgage to be in default.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Subsequent Liens.** Grantor shall not allow any subsequent liens or mortgages on all or any portion of the Property without the prior written consent of Lender.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Florida law.

[redacted]

**MORTGAGE**
**(Continued)**



**TAX[redacted]D LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

[redacted]nt. Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Mortgage at any trustee's sale or other sale held under the provisions of this Mortgage, or at any foreclosure sale of such Property.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Borrower's

[redacted]

**MORTGAGE**
**(Continued)**



In[redacted]ess is paid in full.

**EXISTI[redacted]EBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

**Ex[redacted]en.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to the lien securing payment of an ex[redacted]bligation. The existing obligation has a current principal balance of approximately $110500.00. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Notice of Proceedings.** Grantor shall immediately notify Lender in writing should all or any part of the Property become subject to any condemnation or expropriation proceedings or other similar proceedings, including without limitation, any condemnation, confiscation, eminent domain, inverse condemnation or temporary requisition or taking of the mortgaged Property, or any part or parts of the Property. Grantor further agrees to promptly take such steps as may be necessary and proper within Lender's sole judgment and at Grantor's expense, to defend any such condemnation or expropriation proceedings and obtain the proceeds derived from such proceedings. Grantor shall not agree to any settlement or compromise or any condemnation or expropriation claim without Lender's prior written consent.

**Lender's Participation.** Lender may, at Lender's sole option, elect to participate in any such condemnation or expropriation proceedings and be represented by counsel of Lender's choice. Grantor agrees to provide Lender with such documentation as Lender may request to permit Lender to so participate and to reimburse Lender for Lender's costs associated with Lender's participation, including Lender's reasonable attorneys' fees.

**Conduct of Proceedings.** If Grantor fails to defend any such condemnation or expropriation proceedings to Lender's satisfaction, Lender may undertake the defense of such a proceeding for and on behalf of Grantor. To this end, Grantor irrevocably appoints Lender as Grantor's agent and attorney-in-fact, such agency being coupled with an interest, to bring, defend, adjudicate, settle, or otherwise compromise such condemnation or expropriation claims; it being understood, however, that, unless one or more Events of Default (other than the condemnation or expropriation of the Property) then exists under this Mortgage, Lender will not agree to any final settlement or compromise of any such condemnation or expropriation claim without Grantor's prior approval, which approval shall not be unreasonably withheld.

**Application of Net Proceeds.** Lender shall have the right to receive all proceeds derived or to be derived from the condemnation, expropriation, confiscation, eminent domain, inverse condemnation, or any permanent or temporary requisition or taking of the Property, or any part or parts of the Property ("condemnation proceeds"). In the event that Grantor should receive any such condemnation proceeds, Grantor agrees to immediately turn over and to pay such proceeds to Lender. All condemnation proceeds, which are received by, or which are payable to either Grantor or Lender, shall be applied, at Lender's sole option and discretion, and in such manner as Lender may determine (after payment of all reasonable costs, expenses and attorneys' fees necessarily paid or incurred by Grantor and/or Lender), for the purpose of: (a) replacing or restoring the condemned, expropriated, confiscated, or taken Property; or (b) reducing the then outstanding balance of the Indebtedness, together with interest thereon, with such payments being applied in the manner provided in this Mortgage. Lender's receipt of such condemnation proceeds and the application of such proceeds as provided in this Mortgage shall not affect the lien of this Mortgage.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all intangible personal property taxes, documentary stamp taxes, fees, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax, including without limitation an intangible personal property tax, upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall execute financing statements and take whatever other action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

[redacted]



A[redacted]-Fact. If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name o[redacted] and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for t[redacted]e of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Grantor will be in default under this Mortgage if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Borrower's or Grantor's income, assets, liabilities, or any other aspects of Borrower's or Grantor's financial condition. (B) Borrower does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

**MATURITY DATE.** The maturity date of the obligations secured by this Security Instrument is 30 years from the date of this Security Instrument, as first stated above. The Equity Line Agreement secured by this Security Instrument states that the Beneficiary has the right to extend the draw period during which advances may be obtained and thus, if such extensions are granted, this Security Instrument may be amended, if requested by the Beneficiary or required by law, to reflect an extension of the maturity date of the secured obligations.

**LOSS OF PRIORITY AS TO FUTURE ADVANCES.** If you request a modification of the Security Instrument or if a judgment lien or other lien is placed against the Property with the result in either case that our security interest in the Property loses priority as to future advances over subsequently recorded deeds of trust, or other liens, we shall have the right to suspend additional extensions of credit or reduce your credit limit as well as the right to exercise our other rights under this agreement.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

[redacted]

**MORTGAGE**
**(Continued)**



**Go**[redacted]**ing Law.** This Mortgage will be governed by and interpreted in accordance with federal law and the laws of the State of Flo[redacted] This Mortgage has been accepted by Lender in the State of Florida.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

**Non-Liability of Lender.** The relationship between Borrower and Grantor and Lender created by this Mortgage is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Borrower and Grantor. Borrower and Grantor are exercising Borrower's and Grantor's own judgement with respect to Borrower's and Grantor's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Borrower and Grantor of any matter with respect to Borrower's and Grantor's business. Lender and Borrower and Grantor intend that Lender may reasonably rely on all information supplied by Borrower and Grantor to Lender, together with all representations and warranties given by Borrower and Grantor to Lender, without investigation or confirmation by Lender and that any investigation or failure to investigate will not diminish Lender's right to so rely.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means DENNIS R FOX, and all other persons and entities signing the Credit Agreement.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated May 5, 2003, with credit limit of $50,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. NOTICE TO GRANTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean individually, collectively, and interchangeably any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means DENNIS R FOX and IRIS A FOX.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means SunTrust Bank, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

[redacted]

## MORTGAGE
## (Continued)



**WAIV[redacted]F FUTURE ADVANCES UNDER PRIOR MORTGAGE.** Grantor hereby agrees that the principal indebtedness secured by any mortg[redacted]or security agreements which are senior to the lien of this Mortgage shall not exceed the amount which upon the date of the execu[redacted]f this Mortgage has actually been advanced and is secured by each such prior mortgage and security agreement. As principal indebtedness of such prior mortgages or security agreements is reduced, the maximum amount that may be secured thereby shall also be reduced to the then outstanding principal balance(s). Grantor hereby waives the right to receive any additional or future advances under any such prior mortgages or security agreements. This paragraph shall constitute the notice required by Florida Statutes Section 697.04(b).

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND EACH GRANTOR AGREES TO ITS TERMS.

THIS MORTGAGE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS MORTGAGE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

**GRANTOR:**

X (signature) (Seal)
DENNIS R FOX, Individually

X (signature) (Seal)
IRIS A FOX, Individually

**WITNESSES:**

X (signature) Kimberly A Willar
SIGN AND PRINT NAME

X (signature) Victoria Smith
SIGN AND PRINT NAME

### INDIVIDUAL ACKNOWLEDGMENT

STATE OF Florida )
) SS
COUNTY OF Hernando )

The foregoing instrument was acknowledged before me this 5 day of May, 2003 by DENNIS R FOX, who is personally known to me or who has produced FL DL F300-176-50-180-0 as identification and did / did not take an oath.

Lorraine A Miller
My Commission DD144991
Expires June 12, 2003

(signature)
(Signature of Person Taking Acknowledgment)

LORRAINE A MILLER
(Name of Acknowledger Typed, Printed or Stamped)

(Title or Rank)

(Serial Number, if any)

OR BK 5385 PG 1368
8 of 9

[redacted]

# MORTGAGE
(Continued)



## INDIVIDUAL ACKNOWLEDGMENT

STATE OF Florida )
) SS
COUNTY OF Hernando )

The foregoing instrument was acknowledged before me this 5 day of May, 2003 by IRIS A FOX, who is personally known to me or who has produced FL DL F300-401-52-545-0 as identification and did / did not take an oath.

Lorraine A Miller
My Commission DD144091
Expires June 12, 2003

Lorraine A Miller
(Signature of Person Taking Acknowledgment)

LORRAINE A Miller
(Name of Acknowledger Typed, Printed or Stamped)

(Title or Rank)

(Serial Number, if any)

LASER PRO Lending, Ver. [illegible] All Rights Reserved. - FL [illegible]

04/10/[redacted]0 LandAmerica P.03/06

OR BK 5385 PG 1369
9 of 9

EXHIBIT A

Lot 24, [redacted]N OAKS UNIT ONE, according to the plat thereof as recorded in Plat[redacted] 26, Pages 3[redacted]ugh 33, of the Public Records of Pasco County, Florida.

[redacted]

[redacted]

EXHIBIT C

THIS DOCUMENT HAS BEEN ELECTRONICALLY RECORDED

RETURN RECORDED DOCUMENT TO

90 - 4758141
FOX, DENNIS R

Record and Return To
ISGN Recording Dept.
2330 Commerce Drive, Suite 2
Palm Bay, FL 32905

DOCUMENT PREPARED BY
SunTrust Bank – V Grenfell
Mail Code WMRK-7954
P O Box 85130
[redacted]

# Change In Terms Modification Agreement

*This does not represent an increase in principal indebtedness*
*The current principal amount secured by this agreement is $129,222 24 No new money No taxes due*

This Change in Terms Modification ("Agreement"), made this 16th day of October, 2015, between DENNIS R FOX (hereinafter "Borrower" whether one or more) and DENNIS R FOX and IRIS A FOX (hereinafter "Grantor" whether one or more and being an individual, entity or trust that is not an obligor on the loan, but has an interest in the collateral property securing the Home Equity Line referred to herein) and **SunTrust Bank** ("Lender"), amends and supplements 1) the Home Equity Credit Line Agreement and Disclosure Statement ("HELOC Agreement") previously entered into by the Borrower and Lender with a revolving line of credit up to a original maximum principal amount of $50,000 00\$130,000 00, as amended or supplemented by any Modification of Mortgage ('Modification") or Change in Terms Addendum prior to the date hereof, and (2) the Mortgage, Deed of Trust, or Security Deed, as amended or supplemented by any Modification or Change in Terms Addendum/Modification prior to the date hereof ("Security Instrument") dated May 5, 2003\October 31, 2005 and recorded in Book 5385\6755, at page 1361\384, as Instrument No n/a, of the Land records of PASCO County, FL , which granted a lien upon the real and personal property described in the Security Instrument and defined therein as the "Property", located at 18647 AUTUMN LAKE BLVD HUDSON FL 34667-6471 See attached Schedule A for additional property description

In consideration of the mutual promises and agreements exchanged herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Security Instrument or HELOC Agreement)

1 This Modification is attached to and incorporated by reference as a part of the HELOC Agreement,

2 As of November 12, 2015, the amount payable under the HELOC Agreement and any prior Modification or Change in Terms Modification and the Security Instrument (the "Unpaid Principal Balance") is U S $129,222 24, consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized,

3 Borrower and Lender hereby agree to modify the repayment terms of the HELOC Agreement effective as of **November 12, 2015** in the manner described in Paragraphs 4 and 5,

4 Borrower agrees to pay this loan in 359 remaining payments of $580 24 each, beginning with the payment due December 12, 2015, with all subsequent payments due on the same day of each month thereafter, with a final payment of $577 64 together with any fees, charges, interest, principal and all other unpaid amounts still owed being due on November 12, 2045

5 The Annual Percentage Rate set forth in the HELOC Agreement is amended to a fixed interest rate of 3 50% to take effect November 12, 2015 and to remain such until all unpaid principal, interest, fees or charges are paid in full

6 If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower or Grantor is not a natural person and a beneficial interest in Borrower or Grantor is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument, and

7 Borrower's acceptance of the terms in this Agreement is subject to federal requirements regarding flood insurance As part of processing of this Addendum following Borrower's acceptance of the terms, federal regulations require Lender to determine if the Property is located in a Special Flood Hazard Area ("SFHA") as designated by the FEMA Flood Maps for the community If Borrower's home is located in a SFHA, Borrower will be required to obtain and maintain flood insurance for the remaining term of the HELOC Agreement and, if applicable, the remaining term as modified by this Addendum **If, after Lender notifies the borrower that flood insurance coverage is required, Borrower does not provide Lender proper evidence of flood insurance coverage for the Property within the time required by law, this Agreement will be null and void even if signed by the Borrower Borrower understands and agrees that the flood insurance requirement is not waived or affected by either party's execution of this Agreement** If, at any point during the term of the HELOC Agreement, Lender is notified that the Property is located in a SFHA, Lender is required by federal law to ensure that adequate flood insurance is on file for the Property

8 Borrower and Grantor further understand and agree that

a) All the rights and remedies, stipulations, and conditions contained in the HELOC Agreement and Security Instrument relating to default in the making of payments shall also apply to default in the making of the modified payments hereunder,

b) All covenants, agreements, stipulations, and conditions in the Security Instrument and HELOC Agreement shall be and remain in full force and effect and Borrower hereby reaffirms the same, except as herein modified, and none of Borrower's obligations or liabilities under the HELOC Agreement and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the HELOC Agreement and Security Instrument whether such rights or remedies arise thereunder or by operation of law Also, all rights of recourse to which Lender is presently entitled against Borrower, any property or any other persons in any way obligated for, or liable on, the HELOC Agreement and Security Instrument are expressly reserved by Lender Consent by Lender to this Agreement does not waive Lender's right to require strict performance of the HELOC Agreement and Security Instrument as changed above nor obligate Lender to make any future modifications,

c) **Borrower's line of credit pursuant to the applicable terms of the HELOC Agreement and this Agreement is unavailable for further advances or draws,**

d) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Security Instrument and HELOC Agreement,

e) If any document is lost, misplaced, omitted, misstated or inadequately reflects the true and correct terms of this Agreement, upon request of Lender or any assignee of Lender, Borrower and Grantor agree to comply within ten (10) days of such request to make, execute, initial and/or deliver such other documents or papers as Lender may deem necessary or required to correct and effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower and Grantor, and

f) The terms of this Agreement supersede the terms of any prior Addendum, Modification, forbearance plan or workout agreement that Borrower/Grantor may previously have

entered into with Lender This Agreement may only be modified in writing, signed by both parties

GRANTOR ACKNOWLEDGMENT Any individual, entity or trustee on behalf of a trust signing this Addendum as a Grantor of any interest in the Property rather than as a Borrower or obligor understands and consents to the terms and conditions of this Addendum, but does not become personally liable for any indebtedness referenced herein by doing so However, no existing endorsement or guarantee by the Grantor relating to the Agreement, if applicable, is changed or affected by the Grantor signing this Addendum

Borrower, Grantor _______________ (Seal)
DENNIS R FOX

By _______________ (SEAL)
Witness (Sign & Print Name) Thomas M. Reilly

By Blanche A. Reilly (SEAL)
Witness (Sign & Print Name) Blanche A. Reilly

MARGARET A. PAGANO
Notary Public - State of Florida
My Comm Expires Apr 27, 2018
Commission # FF 116878
Bonded Through National Notary Assn.

On this the 23 day of Oct, 2015, before me Margaret A. Pagano, personally appeared Dennis R. Fox, who is/are personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the above instrument and acknowledged to me that he/she/they executed the same as his/her/their voluntary act and deed

Personally known to me Yes ☐ No ☑
Type of ID submitted DL LIC F200-176-50-184-0

WITNESS my hand and official seal

Notary Signature _______________ (Seal) State of Florida §
My Commission Expires 4/27/18 County of PASCO §

Grantor
_______________ (Seal)
IRIS A FOX

By _______________ (SEAL)
Witness (Sign & Print Name) Thomas M. Reilly

By Blanche A. Reilly (SEAL)
Witness (Sign & Print Name) Blanche A. Reilly

On this the 23 day of Oct, 2015, before me ~~Iris A. Fox~~ Margaret A. Pagano, personally appeared Iris A. Fox, who is/are personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the above instrument and acknowledged to me that he/she/they executed the same as his/her/their voluntary act and deed

MARGARET A. PAGANO
Notary Public - State of Florida
My Comm. Expires Apr 27, 2018
Commission # FF 116878
Bonded Through National Notary Assn.

Personally known to me Yes ☐ No ☑
Type of ID submitted FL DL F200-401-52-595-0

WITNESS my hand and official seal

Notary Signature _______________ (Seal) State of Florida §
My Commission Expires 4/27/18 County of PASCO §

SUNTRUST BANK

Kimberly A. Kurtz (Seal)

By Kimberly A. Kurtz

Its Vice President

State of Virginia §

County/(City) of Richmond §

On this the 26 day of Oct 2015, before me Stephanie Marie Silverman personally appeared Kimberly A. Kurtz, who is/are personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the above instrument and acknowledged to me that he/she executed the same as his/her voluntary act and deed and as the voluntary act and deed of the Lender in his/her authorized capacity on behalf of the Lender

WITNESS my hand and official seal

Notary Signature [signature] (Seal)

My Commission Expires 6/30/19

STEPHANIE MARIE SILVERMAN
Notary Public
Commonwealth of Virginia
7634541
My Commission Expires Jun 30, 2019

## Schedule A

LOT 24, AUTUMN OAKS UNIT ONE, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 26, PAGES 30-33, PUBLIC RECORDS OF PASCO COUNTY, FLORIDA.

EXHIBIT: D

**Post-Default Payment History**

| TRANSACTION DATE | AMOUNT RECEIVED | DATE FUNDS APPLIED | AMOUNT APPLIED TO PRINCIPAL | AMOUNT APPLIED TO INTEREST | AMOUNT APPLIED TO ESCROW | AMOUNT APPLIED TO FEES | TOTAL AMOUNT APPLIED | SUSPENSE |
|---|---|---|---|---|---|---|---|---|
| No Payments Made | $0.00 | N/A | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| | | | | | | | $0.00 | |
| TOTAL: | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

EXHIBIT: E

## Post-Petition Fee Breakdown Addendum

| DESCRIPTION OF FEE OR CHARGE | DATE INCURRED | AMOUNT |
|---|---|---|
| Late Charge Fee | 7/19/2016 | $29.01 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL FEES AND CHARGES DUE | | $29.01 |

EXHIBIT: F

**Post-Petition Taxes-Insurance Advances Addendum**

| DESCRIPTION OF TAX OR INSURANCE ADVANCE | DATE INCURRED | AMOUNT |
|---|---|---|
| No Tax or Insurance Advance | N/A | $0.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL TAX OR INSURANCE ADVANCE | | $0.00 |